## UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
#### TAMPA DIVISION

**JOHN R. MACKENZIE JOBBER, INC.,**

      **Plaintiff,**

**v.**                            **Case No.  8:07-cv-214-T-30MAP**

**MID-CONTINENT CASUALTY COMPANY,**

      **Defendant.**
_____/

## <u>ORDER</u>

THIS CAUSE comes before the Court upon Plaintiff John R. McKenzie Jobber, Inc.'s ("Plaintiff") Motion for Summary Judgment (Dkt. 9), Defendant Mid-Continent Casualty Company's ("Defendant") Amended Response in opposition to the same (Dkt. 18, Ex. A), and Plaintiff's Reply to Defendant's Amended Response (Dkt. 23).  The Court, having considered the motion, response, reply, and memoranda, and being otherwise advised in the premises, determines that Plaintiff's motion should be denied.

### Background

Plaintiff owns and operates a retail gas station located at 13200 U.S. Highway 301, Dade City, Pasco County, Florida (the "Site").  On or about December 3, 2003, Plaintiff submitted an application to Defendant for pollution liability and environmental damage insurance.  Upon review of Plaintiff's application, Defendant issued and delivered to Plaintiff

Pollution Liability and Environmental Damage Policy Number 04-TO-00060007 (the "Policy"), with a policy period of January 18, 2004, to February 17, 2005, and a retroactive date of March 1, 1990.[1]

The Policy provided coverage for third party and environmental damages resulting from confirmed releases of petroleum products.  Such coverage was limited to confirmed releases occurring after the retroactive date and prior to the expiration of the policy period.  Specifically, the Policy provided Plaintiff with the following coverage:

> Coverage B.  We will pay clean up costs incurred by an insured for environmental damage that an Insured is legally obligated to pay from scheduled Storage Tank System(s) as a result of a Confirmed Release(s) provided the Confirmed Release(s) commences after the Retroactive Date.  All claim(s) must be reported to the company, in writing, by the Named Insured during the Policy Period or Extended Reporting Period, if applicable.  This insurance applies only if a limit is shown for Coverage B in the declarations page.

See Policy, Pollution Liability and Environmental Damage Coverage Form at p. 1 of 9, attached as Exhibit "1" to the Affidavit of Sharon Waite.   Under the Policy, a "Release was defined as:

> any spilling, leaking, emitting, discharging, escaping, or leeching of one or more Regulated Substances from a Storage Tank System into groundwater, surfacewater, surface or subsurface soils, or the atmosphere.

Id. at p. 2 of 9.  A "Confirmed Release" was defined as:

> a release that has been investigated and confirmed by or on behalf of an insured utilizing a system tightness check, site check or other procedure

---

[1]The Policy provided pollution and environmental damage coverage for the Site and for other retail gas stations owned by Plaintiff.

approved by the implementing Agency in accordance with 40 C.F.R. 280.52
or another applicable federal or state regulation or state statute.

Id. at p. 2 of 9.  The Policy also contained an extended reporting period for claims reported

to Defendant within six (6) months of the effective date of cancellation or non-renewal of the

policy.[2]

In 2004, Plaintiff retained Creative Environmental Solutions ("CES") to perform a

closure assessment (the "Closure Assessment") in connection with the closure and

abandonment of two underground petroleum storage tanks ("USTs 1 and 2") at the Site.[3]

Upon completion of the Closure Assessment in December of 2004, CES submitted a Tank

Closure Assessment Report to Plaintiff and the Florida Department of Environmental

Protection ("FDEP").  The report revealed that levels of naphthalene in soil samples collected

from the Site exceeded state target limits.  The report also indicated "strong petroleum odors"

and high organic vapor analyzer ("OVA") readings recorded in soil samples taken from the

Site.  In a letter dated March 28, 2005, the FDEP informed Plaintiff that the reported

contamination required Plaintiff to initiate a Site Assessment and prepare a Site Assessment

Report in accordance with Chapter 62-770 of the Florida Administrative Code.

---

[2]The extended reported period only applied if an insured's replacement policy did not have same or earlier retroactive date as that of the Policy.  Plaintiff obtained a replacement policy from Zurich American Insurance Company with a retroactive date of February 17, 2005.  Thus, the extended reporting period applied to the Policy.

[3]The closure requirements for out-of-service storage tank systems are set forth in Rule 62-761.800 of the Florida Administrative Code.

Plaintiff performed an initial Site Assessment and conducted additional assessment activities as required by the FDEP.  Plaintiff claims such assessment activities continue to date, and that the FDEP will require Plaintiff to complete the assessment, submit a clean up plan, and clean up the contamination in accordance with Chapter 62-770, F.A.C.  Further, Plaintiff claims that the costs associated with the assessment and clean-up of the Site were the result of a Confirmed Release and are thereby covered under the Policy.

On or about April 7, 2005, Plaintiff submitted a claim to Defendant for coverage of the costs associated with the alleged Confirmed Release.  Defendant denied Plaintiff's claim by letter dated December 19, 2005.  The letter notes the following in support of Defendant's denial of coverage: (i) Plaintiff's Discharge Report Form, completed on February 25, 2005, did not reference the type of substance, source of discharge, or cause of discharge and marked actions taken as "none," (ii) an investigation of county inspection records, inventory records, and the electronic leak detector located at the site failed to provide evidence of any leaks or problems, and (iii) Plaintiff had a documented history of non-compliance regarding the timely removal of  USTs 1 and 2 from service.

On or about March 15, 2006, Plaintiff retained CES to perform a site assessment of the Site (the "2006 Site Assessment").  The 2006 Site Assessment reported strong petroleum odors detected in soil samples taken from several soil borings.  Specifically, the report noted samples taken from the soil borings identified as SB-16 and SB-17 yielded high levels of petroleum vapors that persisted to the top of the water table.  Trace to high levels of benzene, toluene, ethylbenzene, total xylenes ("BTEX"), Polycyclic Aromatic Hydrocarbons

("PAHs"), and Total Recoverable Petroleum Hydrocarbons ("TRPH") were detected in the soil samples, the highest of which were found in the sample taken from SB-16.  Soil borings SB-16 and SB-17 were taken from soil located within close proximity to the underground storage tank identified as UST 4.[4]  Additional contaminants in excess of state target levels were identified in groundwater samples taken from the monitoring well identified as MW-1, which was located between USTs 4 and 5.[5]  CES concluded that soil and water impacts had been properly delineated and recommended preparation of a Remedial Action Plan to address the soil and groundwater impacts.

Plaintiff has filed an Affidavit of George K. Foster, dated March 20, 2007 (Dkt. 15). In the affidavit, Foster claims to be the geologist employed by CES to direct and supervise various site assessments of the Site.[6]  Foster claims to have submitted Site Assessment Reports to the FDEP on July 10, 2005, and March 15, 2006, concluding that UST 4 was the suspected source of petroleum contamination at the site.  At Plaintiff's request, CES performed a detailed investigation of the contamination at the Site during December 2006 and January 2007.  As part of the investigation, CES retained J&J Equipment, Inc. ("J&J"), to test the leak integrity of spill contaminant buckets at the facility.  The results of the investigation were set forth in a report dated January 24, 2007 (the "CES Report").

---

[4] A total of 7 underground storage tanks were identified in the 2006 Site Assessment, hereafter referred to as USTs 1-7.

[5] Trace amounts of additional contaminants at concentrations below state target levels were detected in samples taken from monitoring wells MW-1, MW-2, and MW-3.

[6] Foster also claims to be a principal of CES.

According to the CES Report, J&J conducted hydrostatic tests of the spill buckets for USTs 3, 4, and 5 on December 11, 2006.  The tests revealed a leak in the spill bucket for UST 4, which lost three inches of water in eight hours.  On December 12, 2006, the concrete surrounding UST 4 was removed and a CES geologist examined the exposed soil.  The geologist observed soil saturated with gasoline immediately adjacent to the spill bucket for UST 4 ("Spill Bucket No. 4"), on the shoulders of UST 4, and between the spill bucket and SB-16 and SB-17.  No significant impact was found around the spill buckets for USTs 3 and 5.  The CES Report notes that J&J reported a compression flange between Spill Bucket No. 4 and the fill pipe was found to be broken, which it believed caused the leak.  J&J removed the contaminated soil on December 20, 2006, and replaced the concrete on December 21, 2006.  The CES report, signed by George Foster, contained the following conclusions:

> It is my professional opinion that the contamination in the soil and the groundwater at this facility emanated from the spill bucket on UST No. 4. There is no evidence at all that the contamination came from the two USTs abandoned in place in 2004 (USTs No. 1 and 2).

Plaintiff filed the instant action in state court, alleging Defendant wrongfully and illegally denied its claim.  Plaintiff has asserted claims for declaratory judgment of its rights under the policy (Count I) and breach of contract (Count II).   On February 1, 2007, Defendant removed the instant action to this Court.  Defendant claims that no coverage exists under the Policy because (i) there is an issue of fact as to the cause and source of the contamination, and (ii) Plaintiff has failed to carry its burden of establishing the occurrence of a Confirmed Release.  Further, Defendant argues that Plaintiff's application for the Policy

contained material misrepresentations concerning contamination at the Site and compliance with state administrative regulations.

## Discussion

### I.  Summary Judgment Standard

Motions for summary judgment should only be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)(emphasis in original).  The substantive law applicable to the claimed causes of action will identify which facts are material.  Id.  Throughout this analysis, the judge must examine the evidence in the light most favorable to the non-movant and draw all justifiable inferences in his or her favor.  Id. at 255.

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial.  Celotex, 477 U.S. at 324.  The evidence must be significantly probative to support the claims.  Anderson,  477 U.S. at 248-49 (1986).

This Court may not decide a genuine factual dispute at the summary judgment stage. Fernandez v. Bankers Nat'l Life Ins. Co., 906 F.2d 559, 564 (11th Cir. 1990). "[I]f factual issues are present, the Court must deny the motion and proceed to trial." Warrior Tombigbee Transp. Co. v. M/V Nan Fung, 695 F.2d 1294, 1296 (11th Cir.1983). A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson, 477 U.S. at 248; Hoffman v. Allied Corp., 912 F.2d 1379 (11th Cir. 1990). However, there must exist a conflict in substantial evidence to pose a jury question. Verbraeken v. Westinghouse Elec. Corp., 881 F.2d 1041, 1045 (11th Cir. 1989).

## II.     Legal Analysis

### A.     Coverage Under the Policy

Defendant argues that no coverage exists under the Policy. First, Defendant argues a material issue of fact exists regarding the cause and source of the contamination at the Site. Defendant's argument is supported by the Affidavit of Paul Muthig (Dkt. 18-2). In the affidavit, Muthig asserts that he is the President of Muthig Environmental, which assesses environmental contamination at fuel facilities around the country. Muthig claims that the following facts set forth in the CES Report are not indicative of a release from Spill Bucket No. 4 during the policy period: (i) despite the fact that the spill bucket was leaking at a rate of three inches of water per eight hours, only the soil immediately beneath and around the spill bucket was saturated with gasoline, (ii) the gasoline in the soil was not degraded, (iii)

the 2006 Site Assessment reports "strong petroleum odors and vapors" encountered in the soil, while the 2007 CES Report describes the soil as "saturated" with gasoline.

Because Muthig believes these facts are not indicative of a release occurring prior to April of 2005, he concludes that the "contamination discovered on December 21, 2004, and reported on April 13, 2005, could not have come from the #4 spill bucket." Thus, Defendant argues Muthig's affidavit creates a material issue of fact concerning the source and cause of the contamination. Defendant further argues that Plaintiff has failed to establish a "Confirmed Release" occurred within the policy period, as the only source of contamination identified by Plaintiff is the leak from Spill Bucket No. 4. Absent another confirmed source of contamination within the policy period, Defendant argues Plaintiff has failed to establish the occurrence of a "Confirmed Release."

Under Florida law, an insured has the burden of proving that a claim against it is covered by an insurance policy. LaFarge Corp. v. Travelers Indem. Co., 118 F.3d 1511, 1516. However, an insurer has the burden of proving an exclusion to coverage. Id.

The Court concludes Muthig's affidavit creates a material issue of fact regarding the source of the contamination at the Site. Whether the leak from Spill Bucket No. 4 occurred within the policy period and caused the contamination reported in April of 2005 should be determined by a jury. Further, Plaintiff has not identified another source or cause of the contamination. Assuming Defendant is correct regarding its position that the contamination reported in April of 2005 was not the result of the leak from Spill Bucket No. 4, it follows that the reported contamination had to come from some other source. As Plaintiff has not

identified another source or cause of the contamination, the only potential "Confirmed Release" for consideration at this time is the leak from Spill Bucket No. 4.   Due to the material issue of fact regarding the timing of this release, the Court concludes that Plaintiff's motion for summary judgment should be denied.

### B.      Material Misrepresentations

Defendant argues that Plaintiff made two material misrepresentations on its application for the Policy.  When asked whether it was "aware of any circumstances which could give rise to a pollution incident with regard to any sites," Plaintiff answered "No." Defendant argues that a Phase I/Limited Phase II Environmental Assessment (the "2000 Environmental Assessment") conducted by Terra Tech Enterprises, Inc. ("Terra Tech") in April of 2000 reported significant Organic Vapor Analyzer/Flame Ionization Detector ("OVA/FID") readings in soil samples taken from dispenser islands at the Site.  Defendant claims it would not have issued the Policy had it been made aware of these OVA/FID readings.

Defendant also claims it would not have issued the Policy had it been made aware of a cathodic protection survey conducted by Southern Cathodic Protection on October 29, 2003.  In a letter to Plaintiff dated January 26, 2004, the FDEP warned Plaintiff that the Site "may be in violation of Chapter 62-261" of the Florida Administrative Code.  The FDEP noted the following concerns with respect to the site: (i) Plaintiff's storage tank system failed the cathodic protection survey; (ii) USTs 1 and 2 had been out of service longer than the required time limit set forth in Rule 62-761.00(2)(b), F.A.C., and (iii) certain records

regarding financial responsibility had not been made available to the FDEP.  On or about December 3, 2003, Plaintiff answered "Yes" on the Policy application when asked "[a]t the time of application, are all of the applicant tanks listed in this application in compliance with effective regulations set forth by the United States Environmental Protection Agency and any state agency with responsibility for protection of its environment or authority to implement the regulations for protecting its environment?"  Defendant claims this answer materially misrepresented Plaintiff's compliance with the Florida Administrative Code and that it would have not have issued the policy had it been aware of this fact.

Upon review of the 2000 Environmental Assessment and the FDEP letter, the Court rejects Defendants arguments regarding material misrepresentation.  Regarding the OVA/FID readings, the 2000 Environmental Assessment noted that "[t]his kind of limited impact is inevitable with this type of operation and by itself does not indicate significant contamination."  Furthermore, Terra Tech concluded the results of the 2000 Environmental Assessment "suggest that the environmental integrity of the property has not been significantly impacted by current or past on-site practices and conditions, other than those normally associated with this type of operation."  Based on these statements, the Court concludes that no reasonable juror could conclude Plaintiff's answer was a material misrepresentation.

As to the January 26, 2004 letter from the FDEP, the alleged violations of the Florida Administrative Code and the failed cathodic protection survey may have been material to Defendant's issuance of the Policy.  However, Plaintiff did not receive this letter until after

it submitted its application in early December, 2003.  While the cathodic protection survey was conducted on October 29, 2003, it is unclear when Plaintiff was made aware of the results.  As it is unclear whether Plaintiff was aware the Site may have been in violation of the Florida Administrative Code at the time it submitted the Policy application, the Court cannot presently conclude that Plaintiff answer was a material misrepresentation.  However, if Defendant can produce additional evidence on this issue, it may again raise it on a motion for summary judgment.

In conclusion, Defendant has not established at this time that Plaintiff made material representations on its Policy application that would merit the voiding of the Policy.  However, Defendant has raised a material issue of fact regarding the occurrence and timing of a "Confirmed Release" at the site within the policy period.  Accordingly, the Court cannot award summary judgment in favor of Plaintiff.

It is therefore ORDERED AND ADJUDGED that Plaintiff's Motion for Summary Judgment (Dkt. 9) is **DENIED**.

**DONE** and **ORDERED** in Tampa, Florida on November 14, 2007.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel/Parties of Record

S:\Even\2007\07-cv-214.msj plaintiff.frm